IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AMERITAS LIFE INSURANCE CORP.,<br><br>Plaintiff,<br><br>v.<br><br>WILMINGTON TRUST, N.A., as Securities Intermediary,<br><br>Defendant. | C.A. No. _____ |

# COMPLAINT

Plaintiff, Ameritas Life Insurance Corp. ("Ameritas"), files and asserts this Complaint against Defendant, Wilmington Trust N.A. ("Wilmington Trust"), in its capacity as Securities Intermediary, and in support thereof, alleges and says:

## INTRODUCTION

1. This action involves a stranger-originated life insurance ("STOLI") policy that was manufactured on the life of Helen O'Connor, who, on information and belief, was induced to lend her life to investors who procured a $4 million wagering policy on her life (the "Policy") in violation of Delaware's Constitution, insurable interest laws, and public policy.

## PARTIES

2. Ameritas is a life insurance company incorporated under the laws of the State of Nebraska with its principal place of business in the State of Nebraska. Ameritas is therefore a citizen of the State of Nebraska for purposes of diversity jurisdiction.

3. Wilmington Trust is a National Banking Association organized and existing under federal law with its main office located at 1100 N. Market Street, Wilmington, Delaware 19890. Wilmington Trust is a citizen of the State of Delaware for purposes of diversity jurisdiction.

Wilmington Trust is named as a party to this action because, as set forth below, in its capacity as Securities Intermediary, it claims to be the owner and beneficiary of the Policy.

## JURISDICTION AND VENUE

4. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, and because there is complete diversity of citizenship between the Plaintiff, a citizen of Nebraska, and the Defendant, a citizen of Delaware.

5. Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred in the District of Delaware.

## FACTS COMMON TO ALL CLAIMS

6. The Policy is governed by and subject to Delaware law, including because the Policy was a Delaware trust-owned life insurance policy as defined in Delaware's insurable interest statute, 18 *Del. C.* § 2704. More specifically, Delaware's insurable interest statute defines a "trust-owned life insurance policy" as an insurance contract "issued for delivery in this State to a trust established under the laws of this State and having a trustee with its principal place of business in this State." *Id.* at § 2704(e)(4). The Delaware insurable interest statute further provides that a trust-owned life insurance policy "shall be governed by [Delaware's insurable interest laws] without regard to an insured's state of residency or location." *Id.* at § 2704(e)(4), (g). Notably, here, upon information and belief, the Policy was issued for delivery to the Helen O'Connor Insurance Trust, which is a Delaware trust, in Delaware, and was signed for by, upon information and belief, the trustee, Jonathan S. Berck (DE) LLC.

7. As stated by the Supreme Court of Delaware, it is well recognized that "[s]ince the initial creation of life insurance during the sixteenth century, speculators have sought to use insurance to wager on the lives of strangers." *PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Trust*, 28 A.3d 1059, 1069 (Del. 2011) ("*Price Dawe*"). Insurance policies which are procured as a wager

on the life of the person insured not only violate Delaware's constitutional prohibition on wagering, but they also violate Delaware's insurable interest requirement, which precludes investors from manufacturing life insurance policies for the purpose of resale. *Id.*

8. Although speculators have been around for hundreds of years, never has the human life wagering problem been more wide-spread or involved such vast amounts of money than in recent years. In the early 2000s, institutional investors began pooling large blocks of high-value life insurance policies into special purpose vehicles, such as tax-exempt entities or trusts, the interests of which were securitized and sold to other investors. *See*, *e.g.*, Susan Lord Martin, *Betting on the Lives of Strangers: Life Settlements, STOLI, and Securitization*, 13 U. Pa. J. Bus. L. 173, 192 (2010).

9. It is well established, however, that in the early 2000s, there was not a sufficient supply of existing life insurance policies to satisfy investor demand. In particular, investors were interested in high face amount policies insuring the lives of senior citizens, but there were only "a limited number of seniors who had unwanted policies of sufficiently high value." *Price Dawe*, 28 A.3d at 1070. "As a result, STOLI promoters sought to solve the supply side shortage by generating new, high value policies." *Id.*

10. The STOLI transactions orchestrated by these funders were presented to hand-selected senior citizens in rosy terms that camouflaged the transactions' impropriety as being a "risk-free" opportunity, "just a good deal," or as being similar to "hitting the lottery" or acquiring a winning "bingo" card.

11. The specific mechanisms by which each funder's STOLI program operated could and often did vary in one respect or another. But each shared basic similarities including that the

policies at issue were procured and paid for by third parties without an insurable interest in the insureds.

12. In Delaware and elsewhere, these STOLI transactions violate constitutional bans on wagering and insurable interest laws and they take advantage of senior citizens and otherwise distort the proper use of life insurance—which is to provide actual protection to an insured's family or others with an insurable interest—into a cash machine whereby strangers to the insured are actually more interested in seeing the insured dead than alive.

**A.     The Life Product Clearing Program**

13. One such STOLI scheme was through a family of companies known as Life Product Clearing ("LPC"). The LPC scheme was found to be designed to improperly induce insureds to take out policies for investors, by the Delaware Superior Court in *Sun Life Assurance Company Canada v. Wilmington Trust, N.A.*, 2022 WL 179008 (Del. Super. Ct. Jan. 12, 2022) (*DeBourbon/Frankel*).

14. This LPC scheme is what is known in the STOLI industry as a beneficial interest transfer deal or "front-end" STOLI scheme. Under this type of STOLI scheme, life insurance policies are procured through sham trusts using form trust agreements. To conceal from the insurance company the fact that the policy is STOLI, the sham trust typically remains the record owner of the policy while the beneficial interest in that sham trust is transferred behind the scenes to an investor, who then effectively owns the policy.

15. As the Delaware Superior Court observed in *DeBourbon/Frankel*, LPC had an established procedure, where it would (1) identify prospective insureds, through a network of producers, that fit its investment criteria, (2) make pre-issuance offers to the insureds for 2-3% of the policy's face amount, and then (3) purchase the beneficial interests in the trusts that were created to own the policies within a few weeks after the policies were issued. 2022 WL 179008,

at *2-3 (describing LPC program and noting "[t]he purpose of LPC was to use investor money to generate and acquire policies on the lives of certain seniors.").

16. To induce certain seniors that fit the investment criteria to participate in the LPC program, the program made clear that the insureds would not be required to pay, nor be liable for, any out-of-pocket expenses or premium costs. *Id.* at *2 ("LPC's marketing materials explicitly state that 'under the program, you will have no out-of-pocket expenses, nor will you be liable for any of the premium costs of the policy.'").

**B.   The Application and Issuance of a $4 Million Life Insurance Policy**

17. In November 2006, Union Central Life Insurance Company ("Union Central") received a completed "Application for Insurance" (the "Application"), seeking a $4 million universal life insurance policy on the life of Helen O'Connor (the "Insured"), who was then 75 years old. A true and correct copy of the Application, with appropriate redactions of personal identifying information, is attached as Exhibit A.

18. The Application represented that the Insured had gross annual unearned income (dividends, interest, net real estate income, etc.) of $225,000, and a net worth of $5.5 million. *Id.* at 4. The Application identified the sought-after policy to be for "Estate Tax." *Id.* at 12.

19. The Application identified the owner and beneficiary of the proposed policy as the "Helen O'Connor Insurance Trust," a Delaware trust (the "Trust"). *Id.* at 2.

20. The Application identified the Trust as a Delaware trust, formed under Delaware law on September 13, 2006, and acting at the direction of a Delaware trustee, Jonathan S. Berck (DE) LLC, a limited liability company located at 501 Silverside Road, Suite 105, Wilmington, DE 19809. *Id.* at 2.

21. The Application represented that the Insured signed the Application in Wilmington, Delaware, on November 30, 2006. *Id.* at 11.

22. The Application was also signed on November 30, 2006, in Wilmington, Delaware, by Jonathan S. Berck ("Mr. Berck"), as trustee of the Trust. *Id.* The Application was also signed by insurance producer, Steven Lockwood ("Mr. Lockwood").[1] *Id.*

23. On or about January 17, 2007, Union Central received a Statement of Policyowner and Agent Intent. According to the form, signed by the Insured, Mr. Berck, and Mr. Lockwood, (1) they did not intend to assign or sell the policy, (2) no one had offered to pay for the policy, (3) no one had offered "free" or "no cost" insurance, and (4) the policy and premiums would not be financed in any way. A true and correct copy of the Statement of Policyowner and Agent Intent is attached hereto as Exhibit B.

24. On or about February 9, 2007, in reliance on the Application, Statement of Intent, and other documents and information provided to Union Central, Union Central issued policy number U000036405 (the "Policy"), insuring the life of the Insured, with a face amount of $4 million, to the Trust for delivery in Delaware to the Delaware Trustee.

25. The Trust, however, was a sham, because on information and belief it was nominally funded and created as a means to conceal the fact that it was being used to feign technical compliance with Delaware's common law and statutory insurable interest laws. Accordingly, the trustee of the Trust lacked any valid insurable interest in the Insured's life.

---

[1] As noted in *DeBourbon/Frankel*, Mr. Lockwood was the co-founder of the LPC scheme (along with other co-founder, Martin Fleisher) and described its purpose to procure life insurance policies through trusts with an understanding that LPC would purchase the beneficial interests and subsequently sell them to investors. 2022 WL 179008, at *2. Mr. Berck also served as trustee for a Delaware trust involved in the LPC program in *DeBourbon/Frankel*. *Id.* at *3 ("The Frankel Trust listed a lawyer, 'Berck', as the initial trustee.").

26. On or about February 5, 2007, Mr. Berck, as trustee of the Trust, executed a delivery receipt form acknowledging receipt. A true and correct copy of the Policy Delivery Receipt is attached hereto as Exhibit C.

27. On or about February 28, 2007, Union Central received a payment for the initial premiums in the amount of $162,360. Upon information and belief, the payment was not made by the Insured or any person or entity with an insurable interest in the Insured's life.

28. On or about March 5, 2010, Union Central received a letter from Martin Fleisher, manager of Villa Capital LLC (and co-founder of the LPC program),[2] enclosing a request to change the ownership and beneficiary designations of the Policy from the Trust to Villa Capital, LLC, which request was purportedly executed by Mr. Berck, as trustee of the Trust.

29. On or about February 9, 2011, Union Central received a request to change the ownership and beneficiary designations of the Policy from Villa Capital, LLC to the ESF QIF Trust, through Deutsche Bank Trust Company Delaware, as its trustee.

30. On July 1, 2014, Union Central merged into Ameritas, and as a result, with respect to the Policy, Ameritas is the successor in interest to Union Central.

31. On or about September 3, 2014, Ameritas received a request to change the ownership and beneficiary designations of the Policy from ESQ QIF Trust to Wilmington Trust, as Securities Intermediary for an undisclosed third party, which remains the current owner and beneficiary of the policy.

---

[2] Per Delaware's Secretary of State's corporate records, Villa Capital LLC's sole member is a Delaware limited partnership, "LPC Holdings I LP." LPC Holding I LP's general partner is a Delaware limited liability company, "LPC GP I LLC."

## C. The Policy was Procured as Part of an Illegal Wagering Scheme to Gamble on the Life of Ms. O'Connor

32. Ameritas has determined, on information and belief, that the Policy was an illegal wager on the life of Ms. O'Connor and that it was procured as part of the LPC STOLI scheme in violation of, among other things, Delaware's strict constitutional prohibition on wagering.

33. Ameritas has further determined, on information and belief, that the Policy lacked an insurable interest prior to and at its inception, and that any appearance of insurable interest was superficial only and was in reality a complete and total sham designed to conceal the true wagering nature of the Policy.

34. Ameritas has further determined, on information and belief, that the Trust itself was an illegal sham created to give the false appearance of a valid insurance trust for valid estate planning purposes, and thus give the superficial—but entirely false—appearance of a legitimate insurable interest.

35. Moreover, upon information and belief, the source of the funds for the initial premium payment on the Policy was not the Insured or any person or valid entity possessing an insurable interest in her life. Instead, the source of the premium was a family of companies known as Life Product Clearing or LPC and/or other associated third-party investors, persons, or entities who lacked an insurable interest in the Insured's life and were participating in a wager on her life. *See supra* ¶¶ 10-13, 23; *see also DeBourbon/Frankel*, 2022 WL 179008, at *2-3.

36. Upon information and belief, LPC ran a STOLI scheme through which it solicited third-party investors to invest in funding of life insurance policies on the lives of strangers, such as the Insured.

37. Upon information and belief, LPC solicited investments from these third-party investors, pooled the investments together, and used the pooled funds to fund premium payments for policies issued to sham trusts that were established to serve as record owners of these policies.

38. Upon information and belief, the individuals whose lives were insured under the LPC program lent their names and their lives to this gamble with an understanding and/or agreement, prior to the application for a policy, that the beneficial interests in these sham trusts would be transferred to third-party investors after the issuance of the proposed policies, all in exchange for a fee. *See DeBourbon/Frankel*, 2022 WL 179008, at *2 (describing that "LPC's marketing materials described its insurance strategy as one where the potential client was entitled to receive up-front compensation equal to 3% of the policies face amount if the client elected to participate.").

39. Upon information and belief, once the policies were issued, this understanding and/or agreement was formalized in beneficial interest transfer agreements, in which the insureds and/or named beneficiaries agreed to transfer the beneficial interests of the trusts to the third-party investors. *Id.* at *3 (observing that the co-founders of the LPC program "retained law firms for the purpose of having the policy issued to a trust, then the insured puts the policy in force. Then [the co-founders] Fleischer and Lockwood would have the beneficial interest transferred within a few weeks.").

40. Upon information and belief, the trustee of the sham trust was chosen and appointed by LPC. Thus, at all times the policies were controlled by LPC on behalf of the investors.

41. Upon information and belief, the instant Policy was procured pursuant to this scheme.

42. Upon information and belief, before any application concerning the Insured was ever submitted to Union Central, LPC solicited third-party investors (with no insurable interest in the Insured's life) through what it referred to as "capital calls" and received commitments from these investors to fund the premiums for any policy to be issued on the Insured's life.

43. Upon information and belief, the Trust was nominally funded with money not from the Insured or any person with an insurable interest in the Insured's life, but by LPC or others with no insurable interest in the Insured using funds invested by third-party stranger investors.

44. Upon information and belief, before the Policy was ever issued, there was an understanding and/or agreement that the beneficial interest in the Trust would be transferred to third-party investors.

45. Upon information and belief, Mr. Berck was selected to serve as trustee by LPC on behalf of the third-party investors who were using the Policy and the Trust to gamble on the life of the Insured. Indeed, upon information and belief, the Trust was just one of many trusts for which Mr. Berck serves as trustee on behalf of LPC. *E.g.*, *id.* at *3-4.

46. Upon information and belief, either before the Policy was issued or shortly thereafter, the understanding and/or agreement to transfer the beneficial interest in the Trust was formalized and executed through a Beneficial Interest Transfer Agreement, pursuant to which the Insured and/or her beneficiaries received compensation and the third-party investors were formally named as beneficiaries of the Trust.

47. Upon information and belief, at no point did the Insured or anyone with an insurable interest in her life ever provide the funding to pay any premiums for the Policy; to the contrary, at all times prior to the transfer of ownership of the Policy to Villa Capital, LLC, premiums were funded by LPC, using funds provided by third-party investors.

10

48. None of this was disclosed to Union Central or Ameritas. Instead, upon information and belief, those seeking to procure the Policy, by design, disguised the true wagering nature of the Policy by, *inter alia*:

- Falsely representing that the Insured had established the Trust in Delaware for a legitimate purpose and that the Policy's purpose was for "Estate Tax." Instead, the Trust was established solely for the purpose of serving as a vehicle through which third-party investors would make an illegal wager on the life of the Insured in violation of applicable Delaware law; and

- Taking steps to disguise the true origin of the premium payments which, upon information and belief, were funded by third-party investments funneled through LPC and which those source of funds used for premium payments was persons or entities other than (and unrelated to) the Insured, and at no point did the Insured ever intend to use any of her own money fund premiums.

49. In addition to the above, LPC and other third-party stranger entities who acted in concert with each other to procure and generate the Policy took steps after issuance of the Policy so as to further and continually conceal the true wagering nature of the transaction. Upon information and belief, and among other things, this included:

- Concealing from Union Central and Ameritas the fact that the beneficial interest of the Trust had been transferred to third-party investors either before the issuance of the Policy or shortly thereafter, which was never disclosed to Union Central and Ameritas; and

- Concealing from Union Central and Ameritas the fact that Mr. Berck had been appointed trustee in order to promote the appearance that the Trust was a valid life insurance trust and to conceal the involvement of LPC.

50. Upon information and belief, as part of the illegal wagering scheme, LPC and the other individuals and/or entities acting in concert with each other to generate the Policy misrepresented and otherwise concealed from Union Central and Ameritas that, from the outset, the Policy was never intended to benefit anyone with an insurable interest in the Insured's life, but was instead an instrument allowing stranger investors to gamble on her life.

51. The identities of the true owners and beneficiaries of the Policy were, therefore, continually concealed from Union Central and Ameritas.

52. In sum, on information and belief, the LPC STOLI program operated as follows:

- LPC used network of rogue insurance producers who assisted them by, among other things, identifying senior citizens meeting their investment criteria and causing those seniors to become involved in the STOLI transactions they were orchestrating.

- LPC would have seniors citizens like Ms. O'Connor sign boilerplate trusts documents to create Delaware statutory trusts in the seniors' names.

- Contrary to the insurable interest requirement set forth by the Delaware Constitution, the Delaware Insurance Code, and the Delaware Supreme Court in *Price Dawe* and other cases, these Delaware statutory trusts were minimally funded and were created so that Deutsche Bank could use these trusts to apply for, purchase, hold and/or transfer large life insurance policies on the lives of senior citizens.

- Prior to, or shortly after, issuance of a policy, LPC and/or its entities received the sole beneficial interest in each Delaware statutory trust it created, and thus the interest in every policy owned by such trusts.

- To induce seniors citizens like Ms. O'Connor to permit LPC to carry out its STOLI program, LPC paid, or promised to pay, the insureds financial compensation, in exchange for which LPC, through sham trusts, became the beneficial owner of the trusts used to create the policies.

- LPC and/or its associated entities and investors, and not the insureds like Ms. O'Connor, paid all of the premiums necessary to procure the policies that were owned by such trusts.

53. Thus, on information and belief, LPC operated an illegal STOLI scheme that created life insurance policies lacking insurable interest and that were nothing more than mere wagers, including on the life of Ms. O'Connor.

54. Although Ameritas believes that the Policy is void *ab initio* for lack of insurable interest at inception, Ameritas has reason to believe that Wilmington Trust disagrees. Moreover, Ameritas recognizes that it is the province of this Court to decide this issue and to make a declaration as to the Policy's validity. As a consequence—and without waiver of its right to

challenge the validity of the Policy—Ameritas intends to treat the Policy as administratively in-force for the pendency of the lawsuit, meaning, among other things, that Ameritas will continue to accept premium payments, should Wilmington Trust choose to make them, and to deduct cost of insurance under the Policy's terms and conditions. To be clear, Ameritas is not waiving any rights by continuing to treat the Policy as valid, and is simply maintaining the status quo until the Court provides a final ruling.

## FIRST CAUSE OF ACTION

## DECLARATORY JUDGMENT – ILLEGAL HUMAN LIFE WAGERING CONTRACT

55. Ameritas hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein at length.

56. The Policy was applied for and signed in Delaware by a Delaware statutory trust, as owner and beneficiary of the Policy. The Policy was then actually delivered to the trustee of the Trust, Mr. Berck, in Wilmington, Delaware. For these and additional reasons, the Policy is governed by Delaware law.

57. The Delaware Constitution provides that "[a]ll forms of gambling are prohibited in this State except [those explicitly set forth in the statute]." Del. Const. Art. II, § 17. Moreover, the Delaware Supreme Court in *Price Dawe* addressed the issues associated with life insurance policies used to wager on the death of insureds and has held that, under Delaware law, such policies are mere wagering contracts and are void *ab initio*.

58. As set forth herein, the Policy was, from the outset, procured by third parties and intended as a wager on the life of Ms. O'Connor. Whether Ms. O'Connor knew the details of this scheme or her identity was merely used as an instrumentality to procure the Policy, stranger investors were wagering on Ms. O'Connor's life and hoping to trigger a secondary market cash-in on the Policy's $4 million death benefit.

59. Accordingly, Ameritas seeks, and is entitled to, a declaratory judgment that the Policy was an illegal wagering contract that violated the Delaware Constitution and public policy of Delaware, thus rendering the Policy void *ab initio*, meaning that the Policy never came into existence.

## SECOND CAUSE OF ACTION

## DECLARATORY JUDGMENT – LACK OF INSURABLE INTEREST

60. Ameritas hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein at length.

61. The Policy was intentionally structured to be a "trust-owned insurance policy" as defined by Delaware's insurable interest statute, 18 *Del. C.* § 2704(e)(4). Because the Policy was delivered to the trustee of the Trust, Mr. Berck, in Wilmington, Delaware, the existence of an insurable interest "shall be governed by [Delaware's insurable interest statute] without regard to [the] insured's state of residency or location." 18 *Del. C.* § 2704(g)

62. Under Delaware law, only a valid and legitimate insurance trust can have a valid insurable interest in the life of the insured. *See* 18 *Del. C.* § 2704(c)(5).

63. However, here, because the Trust was an illegitimate cover for the wager on Ms. O'Connor's life, the Trust lacked any insurable interest in the life of Ms. O'Connor. Accordingly, no insurable interest existed at the time of issuance of the Policy, and the Policy is void *ab initio* for lack of insurable interest.

64. Additionally, the Policy was applied for and issued at the behest of individuals or entities—with no insurable interest in the life of the insured—who procured the Policy for the purpose of benefitting stranger investors in the life insurance secondary market. Accordingly, the Policy is void *ab initio* for lack of an insurable interest.

65.     Therefore, Ameritas seeks, and is entitled to, a declaratory judgment that the Policy lacked insurable interest because it was procured by and for the benefit of strangers without an insurable interest under Delaware law.

WHEREFORE, Ameritas respectfully requests the entry of an Order by this Court as follows:

A.      Declaring that the Policy is void *ab initio* due to it having been procured as a wagering contract on the life of Ms. O'Connor;

B.      Declaring that the Policy is void *ab initio* due to it having been procured without a valid insurable interest at inception;

C.      Declaring that because the Policy is void *ab initio* it never existed;

D.      Declaring that because the Policy is void *ab initio* the Court will leave the parties to this illegal contract as it finds them, thus permitting Ameritas to retain some or all of the premiums paid on the Policy;

E.      Awarding Ameritas attorneys' fees and costs associated with bringing this lawsuit, as determined by the Court; and

F.      Awarding Ameritas any further relief this Court deems appropriate.

**COZEN O'CONNOR**

*/s/ Kaan Ekiner*
Kaan Ekiner (No. 5607)
1201 North Market St., Ste. 1001
Wilmington, DE 19801
Tel: 302-295-2046
kekiner@cozen.com

*Attorneys for Plaintiff,*
*Ameritas Life Insurance Corp.*

Dated: July 7, 2022